**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| | * | |
| **v.** | * | |
| | * | **CRIMINAL NO. MJM-23-411** |
| **ADANEGBE GIFT OSEMWENKHAE,** | * | |
| | * | |
| **Defendant.** | * | |
| | ******* | |

**RESPONSE IN OPPOSITION TO DEFENDANT'S PRETRIAL MOTIONS**
**(ECF Nos. 148, 149, 150, 151)**

## TABLE OF CONTENTS

INTRODUCTION .................................................................................................... 1

BACKGROUND .................................................................................................... 1

    A.    The Indictment.................................................................................................1

    B.    The Superseding Indictment.................................................................3

    C.    The Discovery Has Been Extensive, And Organized...................................6

    D.    The February 7, 2024 Federal Search Warrant At 510 Stanwich Terrace,

            Bowie, Maryland.................................................................................13

        1.    Osemwenkhae's Money Laundering Conspiracy Used Fake Identities, Aliases, and Business Entities to Launder Proceeds from Business Email Compromise Schemes ................................................ 14

        2.    The Affidavit Discussed How Gift Laundered the Proceeds in 2022 from Three Different Business Email Compromise Schemes and Extensively Communicated with A Co-Conspirator About it ................ ....................... 15

        3.    SA Rusakiewicz Demonstrated Probable Cause to Believe That Evidence, Fruits, and Instrumentalities Of The Crimes Would Be Found at the Stanwich Residence Based on Physical Surveillance, Gift's Historic Cell Site Data, Gift's Social Media, and Property Records Listing Gift's Mother as the Owner.................................................... .. .. .. .. .. ........ 17

THE DEFENDANT'S OFFENSES ...................................................... 21

ARGUMENT .............................................................................................. 39

I.    The Money Laundering Conspiracy Is Sufficiently Alleged (ECF No. 148)................. 39

    A. There Are Very Minimal Pleading Requirements For A Money Laundering Conspiracy. .................................................................................... 40

    B. The Money Laundering Conspiracy Alleged Against Osemwenkhae and His Co-Defendants Contains Many Detailed Allegations About How The Conspiracy Operated. .................................. .............. 44

    C. The Extensive Discovery, Including Discovery Organized By Fraud Victim, Further Demonstrates That No Bill Of Particulars Is Appropriate. ................................................. 46

    D. This Court Should Be Leery Of Ordering A Bill Of Particulars Because It Necessarily Constrains the Government's Proof At Trial. .......................................................... 48

II.    The Defendant's Motion To Suppress Evidence Obtained Pursuant To A Federal Search Warrant From The Defendant's Residence Should Be Denied (ECF 149). ....... 49

A. Gift Lacks Standing to Challenge the Search of the Stanwich Residence ....................... 50

B. Even Assuming Gift Has Standing, There Was Probable Cause to Search the Stanwich Residence for Evidence of Gift's Crimes. ............................................................................. 53

    1. The Affidavit Demonstrated Probable Cause to Believe That Gift Lived at the Stanwich Residence ............................................................................................................. 53

    2. The Affidavit Established a Sufficient Nexus Between the Stanwich Residence and the Items to be Seized. ............................................................................................... 57

C. Even If Probable Cause was Lacking, Special Agent Rusakiewicz Relied Upon the Warrant in Good Faith ............................................................................................ 59

**III. Defendant's Motion To Set A Deadline For The Disclosure Of Other Crimes, Wrongs, Or Acts (ECF 150)** ............................................................................... 61

**IV. The Defendant's Motion For Pretrial Government Designation Of All Of The Defendant's Admissible Statements Should Be Denied (ECF No. 151)** ....................... 62

**CONCLUSION** ........................................................................................................... 65

## INTRODUCTION

The United States of America, by and through its undersigned counsel, hereby files this omnibus response in opposition to the following pretrial motions filed by Defendant Adanegbe Gift Osemwenkhae ("Osemwenkhae," "Gift," or "Defendant"): (1) motion to dismiss the Indictment, or in the alternative, for a bill of particulars (ECF 148); (2) motion to suppress the fruits of a federal search warrant (ECF 149); (3) motion to set a deadline for the disclosure of other crimes, wrongs, or acts (ECF 150); and (4) motion for specification of defendant's statements (ECF 151).   For the reasons set forth below, all of the motions should be denied.

## BACKGROUND

A.  The Original Indictment

According to the Indictment returned in November 2023 against the Defendant and nine other defendants, Osemwenkhae allegedly participated in a money laundering conspiracy lasting more than four years and involving at least ten co-defendants and numerous other named and unnamed co-conspirators.[1]  *See* ECF 1.   As alleged, Osemwenkhae and his co-conspirators formed an illegal agreement to conduct and attempt to conduct financial transactions involving the proceeds of a specified unlawful activity, that is wire fraud, with the intent to promote the carrying on of the specified unlawful activity, or knowing that the transactions were designed to conceal and disguise the nature of the proceeds of specified unlawful activity, in violation of 18 U.S.C. § 1956.   *Id*.   The wire frauds often involved legitimate businesses or government entities that were deceived through business email compromise schemes about the bank accounts to use when paying invoices and money owed for services or products.   *Id.*

---

[1]     The November 2023 Indictment put Osemwenkhae on notice as to the identities of at least 13 other co-conspirators.

The 14-page November 2023 Indictment set forth information about at least fifteen identified victims/wire fraud transactions, each involving a particular fraud victim.    The Indictment alleged that the purpose of the conspiracy was for the co-conspirators, including the Defendant, to personally enrich themselves and others.    ECF 1, ¶ 8.    It noted how the co-conspirators collectively conducted and attempted to conduct financial transactions involving more than $9.5 million.    ECF 1, ¶ 27.    The Indictment described how the members of the conspiracy created shell entities that did not: have physical operations or business premises; engage in legitimate business activities; earn gross revenues; incur cost of goods sold; incur administrative expenses associated with business operations; report wages for employees to the State of Maryland; or have significant numbers of employees.    ECF 1, ¶ 9.    The Indictment described how the co-conspirators used the shell entities associated with each of them, including the following:

1. Gifted LLC, which Defendant Osemwenkhae controlled;
2. Blue Skye Realty, which co-defendant Emily Gil Arias controlled;
3. Faiz Automobiles LLC, which co-defendant Faizou Gnora controlled;
4. First Realty Management LLC, which co-defendant Faizou Gnora controlled;
5. FB Morgan LLC, which co-defendant Fatoumata Boiro controlled;
6. Smart Logistics LLC, which co-defendant Martin Ogisi controlled;
7. Parker Transports LLC, which Co-Defendant Lakeisha Parker controlled;
8. Blaxstone Enterprises LLC, which co-defendant Lawrence Ogunsanwo controlled;
9. Satisfied Health Care LLC, which co-defendant Blondel Ndjouandjouaka controlled;
10. KC All Pro HVAC Service LLC, which co-defendant Kevin Colon controlled;
11. Colon Enterprise LLC, which co-defendant Kevin Colon controlled;
12. Lorena Perez Herrera LLC, which co-defendant Lorena Perez Herrera controlled;
13. YS Estate and Properties, which co-conspirator Yahya Sowe controlled;
14. Victor's Trucking and Pull LLC, which co-conspirator Victor Killen controlled;
15. Vieta Collection, which co-conspirator Areal El-Lovieta Harris controlled;
16. The Justin Company LLC, which co-conspirator Gedeon Agbeyome controlled; and
17. [Last Name of Identity Theft Victim] Company LLC, which co-conspirator Gedeon Agbeyome controlled.

ECF 1, ¶ 12.

The Indictment also extensively described the use of bank accounts by the members of the conspiracy, including accounts registered to shell entities, but on which the co-conspirators acted as signatories, either in their actual identities or through the stolen identities of other real persons.    The Indictment listed approximately 45 bank accounts that were used in furtherance of the money laundering conspiracy, specifying the banking institution and account number for these accounts involved in the money laundering.    ECF 1, ¶ 16.   The defendants and their co-conspirators used these identified shell entity accounts to receive fraud proceeds that originated with the fraud victims.    After the co-conspirators obtained the fraud proceeds, they engaged in numerous money laundering transactions, including layering the fraud funds through additional accounts, engaging in transactions designed to conceal the wire fraud proceeds, and engaging in financial transactions that had no legitimate business purpose.    ECF 1, ¶¶ 17-20.   The Indictment also discussed the co-conspirators' extensive use of encrypted WhatsApp and Telegram communications, which allegedly caused interstate and foreign wires.    ECF 1, ¶ 23. Finally, the Indictment described how wire fraud proceeds were used for "financial transactions," "international financial transactions," and for the personal benefit of the members of the conspiracy.    ECF 1, ¶ 24-26.

A.    The Superseding Indictment

On December 5, 2024, the grand jury returned a Superseding Indictment against Osemwenkhae and six other co-defendants: Faizou Gnora, Lawrence Ogunsanwo, Lakeisha Parker, Martin Ogisi, Blondel Ndjouandjouaka, Lorena Perez Herrera.[2]   The Superseding Indictment maintained a similar structure to the original Indictment but identified six additional

---

[2]    Multiple defendants who pled guilty or signed plea agreements were not included in the Superseding Indictment.

frauds and fraud victims from which fraudulent funds involved in the money laundering conspiracy originated.   Those additional victims were identified in the Superseding Indictment as Victim SRP LLC, Victim FL, Victim LN, Victim LLC #5, Victim PH LLC, and Victim Blaine, Minnesota.   In addition to listing the victims in the charging document, each victim is described.   *See* ECF 153, ¶ 3.   For example, Victim ABP is described as "an urban redevelopment program that focused on enabling the construction of parks and trails, providing affordable housing, and promoting public health."   *Id.*

As with the original Indictment, the Superseding Indictment alleges a multi-year money laundering conspiracy in Count One, namely that the Defendants and their co-conspirators agreed to "knowingly conduct and attempt to conduct financial transactions . . . (1) with the intent to promote the carrying on of" wire fraud and (2) knowing that the transactions were designed in whole and in part to conceal and disguise the nature, location, source, ownership, and control of the proceeds of" wire frauds.   ECF 153, ¶ 10.   As with the original Indictment, the Superseding Indictment contained multiple allegations and details about how the conspiracy charged in Count One worked.   It alleges – among other things – that "the Defendants and their co-conspirators":

- created and used limited liability Shell Entities.   ECF 153, ¶ 12.
- "opened and controlled bank accounts on which the Shell Entities were listed as the account holders, and members of the conspiracy had signature authority . . . ." ECF 153, ¶ 13.
- used the personal identifying information of real persons.
- obtained and used "counterfeited identification documents."   ECF 153, ¶ 16.
- created, controlled, and used various Shell Entities, which were listed by name along with the co-conspirator associated with each one.   ECF 153, ¶ 17.
- "used the bank account and Cash App accounts that they controlled to receive money originating" with the fraud victims identified in the Superseding Indictment.   ECF 153, ¶ 21.
- "engaged in financial transactions with proceeds from wire fraud schemes, including frauds in which victims were deceived into sending money based on false and fraudulent pretenses, such as being provided with false bank account information for legitimate

vendor payments and false wire transfer information for legitimate transactions."  ECF 153, ¶ 22.

- "engaged in financial transactions with proceeds from . . . Covid-19 related benefit funds, such as EIDLs . . . ."  ECF 153, ¶ 23.
- "caused fraud proceeds to flow through" numerous listed bank accounts that the Defendants and their co-conspirators controlled.  ECF 153, ¶ 24.
- "concealed and disguised the wire fraud proceeds by causing . . . transactions . . . with no legitimate business purpose."  ECF 153, ¶ 25.
- "provided false and fraudulent information to financial institutions"  ECF 153, ¶ 26.
- "concealed and disguised . . . the proceeds by withdrawing, spending, and transferring money from the Shell Entities bank accounts . . . ."  ECF 153, ¶ 27.
- "communicated through encrypted online communication applications"  ECF 153, ¶ 28.
- "obtained and used a portion of the money"  ECF 153, ¶ 29.
- "caused wire fraud proceeds to be sent outside the United States."  ECF 153, ¶ 30.
- "collectively conducted and attempted to conduct financial transactions involving more than $9.5 million."  ECF 153, ¶ 31.

The Superseding Indictment provided further detail about COVID-19 benefit funds that were involved in the money laundering conspiracy, alleging specifically how fraudulent Economic Injury Disaster Loan ("EIDL") funds were unlawfully obtained, including through false and fraudulent representations about eligibility for COVID-19 benefits and the use of real persons' identifying information in furtherance of the COVID-19 frauds.  ECF 153, ¶ 23.  The Superseding Indictment alleged how four different real persons' identities were used by Agbeyome and Boateng in furtherance of the conspiracy.

As to Osemwenkhae, the Superseding Indictment also charged him with 26 specific counts of money laundering related to specific financial transactions.  *See* ECF 153 at 12-15. For each count pertaining to a money laundering financial transaction, the Superseding Indictment identified the amount of the financial transaction, the date, the relevant financial institutions involved, the bank account number(s) involved in the transaction, often listed the individuals involved in the transaction, often listed the nature of the financial transaction (deposit, transfer, withdrawal, and purchase), and other key details.  ECF 153 at 12-15.

B.    The Discovery Has Been Extensive, And Organized

In addition to the information in the Superseding Indictment, Osemwenkhae has been put on notice throughout 2024 as to the nature of the charges and evidence against him through extensive, but well-organized discovery.   This discovery disclosed ample bases of the conspiracy and money laundering charges against him.

The discovery produced in this matter included various Productions, which the government has produced on a rolling basis, beginning soon after Osemwenkhae's arrest.   Each Production contained various folders, which were appropriately labeled, and Indexes (except as to Productions 2 and 5, which only contained data images) that were hyperlinked, allowing defense counsel to quickly locate relevant discovery items.   The hyperlinks capture the folder naming structure, and the filenames within, allowing easy searches to find material.   Even if counsel chooses not to use the hyperlinked discovery, the structure of the folders would assist in counsel's review of discovery.

For example, as detailed during the litigation concerning the Speedy Trial Act, the government provided the Defendant in Production #1 of the discovery with over 300 subpoena responses.   Each subpoena response was listed in a folder based on the entity receiving a subpoena and/or supplying the information to the government, and in many cases, the underlying records contained additional clarifying information, identifying bank statements, bank deposit items, debits/withdrawal items, etc. for defense counsel's convenience in reviewing.   Here is an example of the first 10 folders among the 300+ subpoena responses in Production #1:



A sample of the hyperlinked index for part of the subpoena responses in Production #1 is

shown below:



Production #1 also contained a folder for "Electronic Images," "Surveillance Conducted,"

"SW Execution Materials," and a folder containing information about individual defendants,

such as the Maryland business entities associated with them or license plate reader information.

The folders included identifying information so that counsel could focus on materials most

pertinent to the anticipated defense.   For example, the SW Execution Materials folder contained

folders identifying relevant warrants:[3]



Within the Gift related search warrant folder, there were scanned images of the physical evidence uncovered/seized in the warrant.   The production came with a discovery letter that summarized the contents of the production, including the folder structure.[4]

On or about April 26, 2024, the government made a discovery production solely to Osemwenkhae's counsel.   This production, styled as "Discovery Production AGO-1," contained 11 gigabytes of data, including search warrant materials related to Osemwenkhae, a post-arrest interview of Osemwenkhae, and Osemwenkhae's criminal history.   This material focused on Osemwenkhae, his statements, and the basis for obtaining evidence as to him.   Thus, although the government sought to provide extensive and voluminous discovery, the government also sought to provide tailored and directed discovery to individual defendants, including specifically to Osemwenkhae's counsel.

Throughout the extensive discovery, the government continued its efforts to not only disclose discovery, but to do so in an organized and logical manner so as to assist defendants. On or about June 5, 2024, the government produced Productions 2, 3, and AGO-2 to Osemwenkhae.   As with prior productions, this discovery had a common-sense organization, and a folder structure summarized in an accompanying cover letter:

---

[3]      The redactions do not appear in the original folder structure.
[4]      Additional physical materials were made available for inspection and review.

PRODUCTION 2

| DESCRIPTION | BEG DOC | END DOC |
|---|---|---|
| Additional Phones:<br>  • 2024-2-7 BLONDEL Phone<br>  • 2024-2-7 HARRIS Phone<br>  • 2024-2-7 Lottsford Forensic<br>    Report_SOWEBOIRO SW<br>  • 2024-2-7 Stanwich Forensic Report_GIFT SW | N/A | N/A |

PRODUCTION 3

| DESCRIPTION | BEG DOC | END DOC |
|---|---|---|
| Phones:<br>  • 2024-2-5 Trump iPhone<br>  • BA02RR21BA0001 Bright Boateng phone search<br>    warrant<br>  • ████ i Phone Download<br>  • Ogisi Phone-Forensic Report | N/A | N/A |
| Miscellaneous or Other Items | USA-058599 | USA-058602 |
| Subpoena Responses 351 – 426 | USA-058603 | USA-064953 |

PRODUCTION AGO-2

| DESCRIPTION | BEG DOC | END DOC |
|---|---|---|
| 2404602545 GIFT Pings and Historicals | USA-AGO-000132 | USA-AGO-000172 |
| 2407951513 GIFT Pings and Historicals | USA-AGO-000173 | USA-AGO-000223 |
| additional recordings & images | USA-AGO-000224 | USA-AGO-000270 |
| GIFT Residence SW Misc Docs Photos | N/A | N/A |
| Reports | USA-AGO-000271 | USA-AGO-000278 |

In Production #2, the government provided many of the most pertinent cell phone data seizures, including from Gift's residence and Sowe's residence on February 7, 2024.    At least eight different cell phones were recovered from the Stanwich residence where Gift was arrested. These were produced, as shown below:



The forensic report provided in Production #2 provided additional details about the seized data and allowed for counsel to use hyperlinks embedded in a law enforcement forensic report to view each cell phone.    In Production #3, one of the folders was called "Phones."    As shown in the image below, the "Phones" folder contained four subfolders—identified by owner and contents—containing the relevant data from four cell phone images the government obtained:



On September 27, 2024, the government produced approximately 30 additional subpoena responses, seizure warrants and tracking data, and other materials.    *See* Production 4.    Again, the material was organized into folders and subfolders.

As discussed during the Speedy Trial Act litigation, Production 5 contained more than six terabytes of electronic data that members of the U.S. Attorney's Office cannot even view on computers at the U.S. Attorney's Office (relating to devices seized on February 7, 2024).    As a result, this data had to be produced in a rather unorthodox manner—directly from law enforcement to Mr. Gorokhov.    Nevertheless, it is undersigned counsel's understanding that each device was separately identified, and there was a previously produced forensic report that could further assist in the review of data within Production 5.

In Production 6, out of an abundance of caution, the government's discovery provided affidavits and search warrants to all of the defendants, even if they lacked standing to receive notification or object to the warrant.    *See* Production 6, Search and Seizure Warrants folder. In most cases, counsel for the defendant with the most pertinent interest in the relevant search warrant had previously received a copy of the warrant or warrants pertaining to their client, as discussed above with respect to Osemwenkhae.    For example, the warrant for the Stanwich

10

residence was disclosed to Osemwenkhae on or about April 26, 2024 in "Prod AGO-1." It was then reproduced to all counsel in Production 6.

More recently, the government has undertaken an effort to organize much of the previously produced discovery, and organize it by each fraud victim referenced in the Indictment, and now the Superseding Indictment.    In Production 7, the government reproduced significant portions of discovery, such as bank records, along with agent investigative material, such as link charts showing the flow of fraud proceeds, all organized by the underlying fraud. Each folder not only contained the actual victim's name, but referenced paragraphs in the original indictment, and the relevant time period, as shown below:



Within each relevant fraud folder were folders giving defense counsel further, specific information about the underlying nature of the evidence and the allegations against the Defendant, as shown below with respect to the Victim Trust Fraud, identified in paragraph 3a of the charging documents:



The link charts summarized in a graphic form the financial transactions following the underlying frauds, many of which are now charged as specific acts of money laundering in Counts 2-36 of the Superseding Indictment. Although these link charts are only drafts and are not subject to Rule 16 discovery at this time, the government again tried to provide additional information to the counsel to assist them in understanding the complicated and interwoven activities of the conspiracy. For example, shown below is a portion of the link chart for the Victim Trust fraud related money laundering:



The full link charts or flow charts were provided in Production 7 as .png image files, which allow defense counsel to zoom in on particular transactions related to each underlying fraud. As

shown above, these can be found in the "Flow Charts" folder.   By zooming in on a particular transaction, counsel can observe summary information, such as the date of a transaction, the parties to a transaction, the financial institution involved, the amount of the transaction, and in many cases, the nature of the financial transaction (withdrawal, deposit, cashier's check, etc.). This discovery, along with additional productions anticipated to cover additional wire fraud transactions listed in the Superseding Indictment, should provide counsel with a road map to the investigation/prosecution, fraud by fraud and money laundering transaction by transaction.[5] Moreover, portions of the link charts, bank documents, relevant encrypted communications, and summaries of the money laundering transactions related to particular victims were included in search warrant affidavits provided to the defendants, including detailed information about Victim FL, Victim Larimer County, and Victim Delaware Bay and River Authority Fraud that were included in the affidavit related to the residence at 510 Stanwich Terrace, Bowie, Maryland and produced on April 26, 2024.

D.    The February 7, 2024 Federal Search Warrant At 510 Stanwich Terrace, Bowie, Maryland

On February 7, 2024, law enforcement arrived at Osemwenkhae's residence located at 510 Stanwich Terrace, Bowie, Maryland (the "Stanwich Residence") and executed duly authorized search warrants on Osemwenkhae's person, his vehicle (a white 2022 Mercedes Benz S-class sedan), and the Stanwich Residence.[6]

On or about February 2, 2024, the Honorable Erin Aslan had authorized the search of the Stanwich Residence for fruits, evidence, and instrumentalities of wire fraud, wire fraud

---

[5]    The government obviously reserves the right to revise such draft charts and visual aids prior to trial.
[6]    Osemwenkhae was also arrested pursuant to an arrest warrant issued following the November 2023 Indictment.

13

conspiracy, money laundering conspiracy, and money laundering, in violation of 18 U.S.C. §§ 371, 1343, 1349, 1956, and 1957.   ECF No. 149-1 at 1.   Judge Aslan signed the warrant based on the sworn affidavit of Homeland Security Investigations ("HSI") Special Agent Darren R. Rusakiewicz.   *Id*. at 10–51.

In his affidavit, Special Agent Rusakiewicz described his extensive background as a federal agent, and in these types of investigations in particular.   He explained that he had been a special agent with HSI since March 2009 and that—at the time of the affidavit—he was assigned to the HSI Document and Benefit Fraud Task Force.   *Id*. at ¶ 2.   He further explained that, in that role, he had investigated criminal violations related to money laundering, international money laundering, business email compromise schemes, fraud, bulk cash smuggling, structuring, benefit fraud, credit card fraud, identity theft, controlled substance offenses, and firearms violations.   *Id*.

Special Agent Rusakiewicz also discussed his familiarity with a variety of investigative techniques, which included analyzing telephone pen register and caller identification system data, court-authorized electronic surveillance information, wire intercepts, and physical surveillance.   *Id*. at ¶ 3.   Special Agent Rusakiewicz clarified that the information in the affidavit was based on his investigation, information provided by other members of law enforcement, and documents and records he reviewed. *Id*. at ¶ 4.

### 1. Osemwenkhae's Money Laundering Conspiracy Used Fake Identities, Aliases, and Business Entities to Launder Proceeds from Business Email Compromise Schemes.

Special Agent Rusakiewicz's affidavit attested to facts related to Osemwenkhae's money laundering conspiracy.   *Id*. at ¶¶ 5–12.   Special Agent Rusakiewicz stated that law enforcement had been investigating a complex series of financial transactions involving fraud and fake

identities to obtain access to criminally derived proceeds.   *Id*. at ¶ 5.   He explained that the

scheme involved conspirators opening numerous bank accounts using fake identities, aliases, and

recently incorporated business entities.   *Id*.   Once the accounts had been established, unknown

conspirators then convinced individuals and companies to send money to these accounts based

on false and fraudulent representations.   *Id*. at ¶ 6.   The fraud proceeds were primarily derived

from business email compromise schemes that employed a variety of techniques to defraud

victims, including look-a-like email addresses purporting to belong to an employee and spoofed

email addresses from purported vendors.   *Id*. at ¶ 7.

Special Agent Rusakiewicz explained that based on his investigation to date there was

probable cause to believe that Gift and his co-conspirators were involved in the laundering of the

fraud proceeds.   *Id*. at ¶ 8.   Special Agent Rusakiewicz further explained his investigation had

shown that Gift and his co-conspirators conducted numerous financial transactions with the fraud

proceeds, including cash withdrawals and domestic and foreign wires, to layer the funds and

distance them from the victims.   *Id*. at ¶ 9–10.   Special Agent Rusakiewicz further noted that a

federal grand jury had returned indictments against Gift and several of his co-conspirators for

money laundering.   *Id*. at ¶ 13–15.

> ## 2. The Affidavit Discussed How Gift Laundered the Proceeds in 2022 from Three Different Business Email Compromise Schemes and Extensively Communicated with A Co-Conspirator About it.

Special Agent Rusakiewicz also thoroughly explained Gift's connection to the money

laundering conspiracy.   *See id*. at ¶ 16–54.   Special Agent Rusakiewicz organized the affidavit

by providing a section for three particular frauds—(1) Victim L.C. Fraud, (2) Victim F.L. Fraud,

and (3) Victim D.R.B.A. Fraud.   *Id*.   Under each section, Special Agent Rusakiewicz provided

an overview of the circumstances leading to the respective victim being defrauded.   *Id*.   For

instance, Special Agent Rusakiewicz discussed how Victim L.C. was defrauded through a business email compromise scheme.  *See id.* at ¶¶ 16–18.   Specifically, he explained, Victim L.C. was tricked into believing a business it dealt with had changed their payment procedure and information.   *Id.* at ¶ 17–18.   As a result, Victim L.C. updated its payment information reflect the banking information the fraudsters had provided and unwittingly remitted payment to the fraudsters' account.   *Id.*

Special Agent Rusakiewicz then explained that he and other agents traced the financial transactions conducted with the fraud proceeds.  *See id.* at ¶¶ 19–21, ¶¶ 37–38, ¶¶ 48–49.   Special Agent Rusakiewicz specifically connected Gift to the laundering transactions based on WhatsApp discussions that the agent located on a cell phone belonging to one of Gift's co-conspirators, Bobby Trump.   *Id.* at ¶¶ 22–25.   Special Agent Rusakiewicz explained that law enforcement had obtained Trump's cell phone and had found a WhatsApp chat between Trump and telephone number 301-905-7689.   *Id.* at 22. An image of the chat participants – as shown in the sworn affidavit – is shown below.



Special Agent Rusakiewicz further explained that, based on his investigation, there was probable cause to believe that Gift was the user of telephone number 301-905-7689.   *Id.* at ¶¶ 22–25.   First, telephone number 301-905-7689 was assigned in Trump's WhatsApp account to Gift by name, "Gift Naija 2."   *Id.*   Additionally, law enforcement had found a second telephone

number, 240-460-2545, that was assigned in Trump's WhatsApp to Gift by name ("Gift Naija"), and this number was subscribed to Gift's mother.  *Id*. at ¶ 24.   The affidavit further noted that in reviewing WhatsApp exchanges between "Gift Naija 2" and Trump during the period of the Victim D.R.B.A. Fraud, Special Agent Rusakiewicz found messages where "Gift Naija 2" and Trump arranged to meet in person so that Trump could be handed a $400,000.55 check.  *Id*. at ¶¶ 49–51.   Special Agent Rusakiewicz explained that he was able to determine the location of the meeting and obtained surveillance footage from a nearby business.  *Id*. at ¶ 51.   As the affidavit shows, the surveillance footage captured Gift's Mercedes Benz S-Class sedan at the meeting location.  *Id*.

After connecting Gift to telephone number 301-905-7689, Special Agent Rusakiewicz detailed Gift's involvement in the three frauds by matching financial transactions to WhatsApp communications.  *See id*. at ¶¶ 26–34, ¶¶ 39–46, ¶¶ 49–54.   Special Agent Rusakiewicz's explanation in the affidavit of Gift's involvement based on the WhatsApp messages was detailed, and included photographs of chats, bank transaction details, and deposit slips that Trump and Gift exchanged and that pertained to each of the three enumerated frauds.  *Id*.   This demonstrated the tremendous coordination and lengths the conspirators underwent to insulate money from victims.  *Id*.

> **3.  SA Rusakiewicz Demonstrated Probable Cause to Believe That Evidence, Fruits, and Instrumentalities Of The Crimes Would Be Found at the Stanwich Residence Based on Physical Surveillance, Gift's Historic Cell Site Data, Gift's Social Media, and Property Records Listing Gift's Mother as the Owner.**

After providing an overview of the money laundering scheme and Gift's involvement in it, Special Agent Rusakiewicz then devoted multiple pages in his affidavit to Gift's connection with the Stanwich Residence.  *Id*. at ¶¶ 55–62.   Special Agent Rusakiewicz began by

explaining that he had probable cause to believe Gift lived at and used the Stanwich Residence, though Gift was not the listed purchaser.  *Id*. at ¶ 55.  Special Agent Rusakiewicz, an experienced federal agent, explained that he believed Gift's actions were consistent "with the behavior of someone engaged in money laundering activities and trying to hide their enjoyment of funds far exceeding their legitimate employment."  *Id*.  Special Agent Rusakiewicz then articulated specific facts supporting his belief that probable cause existed to believe Gift lived in and used the Stanwich Residence, and hence that there was probable cause to search it for evidence of Gift's criminal activity.  *See id.* at ¶¶ 56–62.

First, Special Agent Rusakiewicz explained, Gift's mother was the listed purchaser of the residence.  *Id*. at ¶ 56.  Second, historic cell site information for Gift's cell phone showed "numerous hits" in the vicinity of the Stanwich Residence.  *Id*. at ¶ 57.  Third, law enforcement officers had conducted physical surveillance of the Stanwich Residence and observed Gift and/or his Mercedes Benz (which is registered to Gift) at the Stanwich Residence on "at least four (4) occasions in 2023 and 2024."  *Id*. at ¶ 58.  Special Agent Rusakiewicz also inserted photos taken during surveillance of the Stanwich Residence in his affidavit.  *Id*. at 21–24.  Specifically, he included a surveillance photo taken on February 2, 2023—showing Gift at the Stanwich Residence—and two surveillance photos of Gift's vehicle at the Stanwich Residence on January 11, 2024, one showing the vehicle parked in the driveway and the other showing the vehicle exiting the garage.  *Id*.  These photos from the affidavit are shown below.

Surveillance Photo on 02/02/2023 of GIFT exiting **TARGET VEHICLE** at the **TARGET RESIDENCE**:



Surveillance photo on 01/11/2024 of the **TARGET VEHICLE** parked in the driveway of the **TARGET RESIDENCE**:



Surveillance photo on 01/11/2024 of the **TARGET VEHICHLE** exiting the garage of the **TARGET RESIDENCE**:



*Id.*

In addition, the affidavit noted that law enforcement had observed Gift's Mercedes Benz parked in the driveway of the Stanwich Residence on January 31, 2024—**just two days before the search warrant was issued**.   *Id*. at ¶ 60.   This, however, was not the entirety of the investigation law enforcement had conducted to establish a fair probability that Gift lived at and used the Stanwich Residence.   Special Agent Rusakiewicz explained that in addition to surveilling the Stanwich Residence and obtaining a search warrant for the location information of Gift's phone—both of which indicated Gift lived at the Stanwich Residence—Special Agent Rusakiewicz had also identified Gift's Instagram profile and found a video of Gift in the driveway of the Stanwich Residence with his Mercedes Benz parked in the garage.   *Id*. at ¶ 59. This image was also included in the affidavit and is shown below:



Having already exceeded the necessary showing to establish probable cause regarding Gift's connection to the Stanwich Residence, Special Agent Rusakiewicz then articulated the indications he observed during his investigation that caused him to believe that, in addition to money laundering, Osemwenkhae may be providing false information to immigration authorities

regarding his residence.  *Id.* at ¶¶ 61–62.  Special Agent Rusakiewicz explained that registration records for Gift's Mercedes Benz and immigration paperwork listed a different address, and that as of February 1, 2024, Gift had not updated his immigration application to reflect the Stanwich Residence, even though it appeared, based on his investigation, that Gift was living there.  *Id.* at ¶ 61.  Special Agent Rusakiewicz further notes that while Gift's mother is the listed purchaser of the Stanwich Residence, law enforcement officers had not observed her at the residence.  *Id.* at ¶ 62.

Thus, based on his investigation, his training, and his experience, Special Agent Rusakiewicz recognized these circumstances to indicate that Gift's fraudulent paperwork with immigration authorities may be designed to conceal his true address.  He further explained that based on his investigation he reasonably suspected that Gift used his mother as a straw purchaser to conceal his location and ownership of the Stanwich Residence, and/or to evade credit or financial checks and transactions that would have prevented the purchase.  *Id.*

## THE DEFENDANT'S OFFENSES

As discussed above, the Superseding Indictment and underlying discovery make plain the nature of the charges and factual allegations against the Defendant.  The government contends that Osemwenkhae helped to coordinate an intricate and extensive money laundering network involving at least fourteen co-conspirators—laundering money from at least 21 different frauds—over an extended period.  *See* ECF 153, ¶ 3a – 3u.

Nevertheless, in light of Osemwenkhae's claimed confusion about the charged scheme, the Government provides the following overview of what it anticipates the evidence will show at trial, including the overall money laundering scheme, communications and statements by various

co-conspirators, a discussion of certain transactions, and cites to relevant portions of the Government's discovery production.[7]

Pursuant to Osemwenkhae's participation in the money laundering conspiracy, the government contends that Osemwenkhae used online encrypted messaging applications to talk to his co-conspirators, and exchange images and messages with his co-conspirators.   The discovery shows that Osemwenkhae used multiple encrypted communication accounts, including the WhatsApp account ending in 1513 ("WhatsApp 1513"), the WhatsApp account ending in 6294 ("WhatsApp 6294"), the WhatsApp account ending in 7689 ("WhatsApp 7689"), the Telegram account ending in 9727 ("Telegram 9727"), and the Telegram account ending in 0539 ("Telegram 0539").   Several of these accounts, including WhatsApp 1513, were reflected in the cellular phone data seized by law enforcement from the Stanwich Residence on February 7, 2024.   In the encrypted communication applications, Osemwenkhae often was referenced by the usernames D&G, BroFam, Gift, and Gifted.

The government found communications with Gift-related accounts in multiple co-conspirators' phones, including Sowe's phone seized in December 2021.   *See, e.g.*, Production 1, Electronic Images, SOWE and BOIRO, C2_06282409_Apple iPhone 12 Pro Max.   Among other evidence, the discovery and trial evidence will include a 655-page WhatsApp chat included in Production 1 that the government contends shows Osemwenkhae and Sowe specifically discussing particular frauds and financial amounts identified in the Superseding Indictment:

---

[7]      As shown below, this information has been available to the Defendant through the discovery.



**Extraction Report** - Apple iOS Full File system

Cellebrite
www.cellebrite.com

Participants

12407846294@s.whatsapp.net
Bro Fam

12406206150@s.whatsapp.net
Mr Sowe (owner)

Conversation - Instant Messages (1939)

12407846294@s.whatsapp.net Bro Fam
PNC
Status: Read
Platform: Mobile
7/12/2021 6:16:15 PM(UTC+0)

12407846294@s.whatsapp.net Bro Fam
The 1.6
Status: Read
Platform: Mobile
7/12/2021 6:16:20 PM(UTC+0)

12407846294@s.whatsapp.net Bro Fam
Write a check of
$362,000
Status: Read
Platform: Mobile
7/19/2021 4:32:54 PM(UTC+0)

12407846294@s.whatsapp.net Bro Fam
Wells Fargo
Victor Trucking
252,500
100,000 Casher 2 woodforst
75,000 Cash
70,000 wire China
3,000 Cash
4,500 Total Balance
Status: Read
Platform: Mobile
7/26/2021 7:08:30 PM(UTC+0)



Production 1, Electronic Images, SOWE and BOIRO, C2_06282409_Apple iPhone 12 Pro Max (Produced on or about March 11, 2024).

The government anticipates the trial evidence will show Osemwenkhae worked with co-conspirators willing to (i) create limited liability companies to serve as Shell Entities; (ii) open

bank accounts and/or cause bank accounts to be opened in the name of their Shell Entity; and (iii) receive and launder fraud proceeds.

Unlike the co-conspirators who were more exposed on particular bank accounts and receiving fraud proceeds directly, the government contends that Osemwenkhae played a role in the conspiracy by helping to coordinate the flow of the fraud proceeds through the transactions and helping determine the split of the funds from the money laundering.   The government anticipates proving, and the Superseding Indictment alleges, that Osemwenkhae helped facilitate and/or participated in more than $9.5 million of money laundering related to at least the following frauds:

- SBA Frauds (2020);
- Victim LLC #2 (May 2021);
- Victim Trust (July & September 2021);
- Victim LLC #4 (November 2021);
- Victim SRP (December 2021);
- Butte Silverbow County Fraud (Spring 2022);
- Victim Health Center (March 2022);
- Victim Larimer County, Colorado (March 2022);
- Victim FL (June 2022)
- Victim Medical Center Fraud (July & August 2022);
- Victim Delaware Bay and River Authority Fraud (October 2022)
- Victim CCP LLC (October 2022);
- Victim LN (Feb. 2023);
- Victim PH LLC {Peachtree} (March 2023); and
- Victim City Blaine (October 2023)

The government will establish additional details about each fraud at trial.   The money laundering activities related to some of the above frauds are detailed below to give the Court a sense of the Defendant's specific criminal conduct, and to demonstrate the nature of the information available to the Defendant's counsel in the discovery productions.

**Victim LLC #2 more than $350,000, May 2021**

In or about May 2021, Victim LLC #2 was deceived through a business email

compromise scheme into sending a $362,314 wire to a PNC bank account ending in 2768 (PNC

2768"), which was registered to Vieta Collection and controlled by Areal Harris.  *See* USA-

012108, USA-089485, USA-088477, *see also* Flow Chart found at PROD 7\Discovery by

Transaction\3i.   Victim [name omitted] May & June 2021\Flow Charts.   Victim LLC #2

thought it was dealing with a legitimate vendor, and thought that was the entity receiving the

wire, but was deceived by a look-a-like email address that falsely provided different bank

account information for the vendor, here PNC 2768.   *See* USA-089485.   The May 2021 bank

statement for PNC 2768 reflects the deposit:

| **ACH Additions** | | | | |
|---|---|---|---|---|
| Date posted | Amount | Transaction description | | Reference number |
| 05/27 | 362,314.00 | Corporate ACH Cash Disb G  R  Llc R&H | | 0002114006052758 |

USA-012108, USA-088477.

    Soon after Harris obtained custody and control over the fraud proceeds, the government

contends that Harris proceeded to engage in financial transactions pursuant to directions

provided by Sowe and Killen.   These financial transactions included sending PNC 2768 checks

for $173,750 and $98,500 respectively, to Harris's personal bank accounts at Citi ending in 6436

("Citi 6436") and Wells Fargo ending in 3335 ("WF 3335").   *See* Count 8 of Superseding

Indictment (allegation regarding $173,750); USA-012111-0121112 (images of the $173,750 and

$98,500 checks in Production #1, PNC), USA-011942- USA-011968, USA-088474, USA-

088475.   Harris also sent $81,500 from PNC 2768 to Navy Federal Credit Union accounts that

she controlled and $79,500 to a PNC account ending in 2356 ("PNC 2356"), which Killen

controlled.   *See* USA-011942-USA-011968, USA-088473, USA-088472.

    Harris further distributed the fraud proceeds, including by sending $12,969.58 from Citi

6436 to a JPMC account ending in 1531 ("JPMC 1531"), which was controlled by Sowe through his Shell Entity YS Estate and Properties LLC, and sending $63,500 from WF 3335 to JPMC 1531.   *See* Count 9; USA-017418 ($12,969.58), USA-017412 ($63,500).   Sowe then engaged in numerous money laundering transactions including cash withdrawals of $7,000 (June 14, 2021) and $1,000 (June 14, 2021), a transfer of $30,000 to Boiro, and account transfers to Sowe's JPMC account ending in 8673 ("JPMC 8673").   USA-017405, USA-017414.

These amounts were consistent with WhatsApp chats that were seized from a cell phone used by Sowe.   In particular, Sowe's phone contained encrypted WhatsApp chats between Sowe's WhatsApp account ending in 6150 ("Sowe 6150") and WhatsApp 6294, which was listed in Sowe's phone as being associated with the user "Bro Fam," as shown below:







*See* Production #1, Electronic Images\SOWE and BOIRO\C2_06282409_Apple iPhone 12 Pro

Max (full image of phone); *see also* Production #7, Discovery by Transaction\3i.   Victim [name

omitted] May & June 2021\Pertinent Phone Chats\Sowe chat with BRO FAM\Report.pdf (pdf

report with hyperlinks).

In June 2021, Sowe engaged in a WhatsApp chat with Osemwenkhae's WhatsApp 6294

(labeled as Bro Fam in Sowe's phone) about the Victim LLC #2 fraud.   Among other messages,

Sowe sent Osemwenkhae/Bro Fam an image of a Citi 6436 banking document showing the

withdrawal of $58,000 converted into an official bank check payable to Victor Trucking and Pull

LLC and a $9,500 cash withdrawal.

28

 

*Id.* The amounts discussed in this chat matched transactions engaged in as part of the money laundering conspiracy.

On June 8, 2021, Osemwenkhae/Bro Fam sent Sowe a message detailing the splitting of the proceeds from the Victim LLC #2 fraud: "98,500, 24,625 %25 You/account owner, $9,850 %10 D&G, $14,775 %15 Office, $49,250 %50 Shooter/Spammer." The government contends that Osemwenkhae is referenced in this message as "D&G" and was supposed to receive a portion of the fraud proceeds. Sowe then sent another message: "9850+14775+49250=$73875, $73,875-9,500 64,375 left." Osemwenkhae's WhatsApp 6294 then sent WhatsApp 6150 the following message:



On June 9, 2021, Sowe's WhatsApp account sent Osemwenkhae's WhatsApp 6294 an image of the debit card for Harris's Vieta Collection WF 3335, which was used to launder funds on this transaction.   On June 10, 2021, Osemwenkhae/Bro Fam sent Sowe the following message discussing the split of the money:



On June 10, 2021, Osemwenkhae/Bro Fam instructed Sowe via WhatsApp to have Harris obtain a $63,500 cashier's check made payable to Sowe.   This cashier's check was then deposited into JPMC 1531, which Sowe controlled.   Sowe later sent Bro Fam/Osemwenkhae proof that the cashier's check had cleared into his account and that the funds were available.

On June 10, 2021, Osemwenkhae/Bro Fam and Sowe exchanged messages about Harris sending a $50,000 wire to a China Tea Production company:

USA-088672.   Sowe later sent Osemwenkhae/Bro Fam an image of the paperwork for the

$50,000 international wire transfer:



q

USA-088684.

The Victim Trust Fraud (July & September 2021)

In July and September 2021, the Victim Trust sought to make payments to a vendor in

connection with environmental cleanup services provided at the former battery recycling facility.

As a result of a business email compromise involving a look-a-like email address, the Victim

Trust was deceived into sending two wires (in July and September 2021) to a PNC account

ending in 4286 ("PNC 4286"), which was controlled by Agbeyome.   *See* USA-012445 (July

Statement for PNC 4286); USA-078433 - USA-078444 (victim emails).   The PNC bank

statement plainly shows the July 13, 2021 deposit of $1,551,290.06:

**ACH Additions**

| Date posted | Amount | Transaction description | Reference number |
|---|---|---|---|
| 07/13 | 1,551,290.06 | ACH Credit | 6002139013100255 |
| 07/15 | 800.00 | ACH Credit | |

The government anticipates proving at trial that Agbeyome had opened PNC 4286 using

the Shell Entity The Justin Company LLC, which Agbeyome actually controlled, and using the

personal identifying information, including name, date of birth, and social security number of

Identity Victim #1, who was a real person.   *See* USA-012425; USA-012417 (Production #1).

On July 12, 2021, PNC 4286 received $1,551,290.06 from the Victim Trust.   USA-012445

(Production #1).   Soon thereafter, Agbeyome laundered the wire fraud proceeds through the

following transactions:

| 7/12/21 | $367,000.99 | Vieta Collection LLC | Areal Harris | Wells Fargo |
| 7/13/21 | $451,000.99 | Victor's Trucking and Pull LLC | Victor Killen | Woodforest |
| 7/14/21 | $100,000 | Vieta Collection LLC | Areal Harris | Truist |
| 7/14/21 | $483,500 | Victor's Trucking and Pull LLC | Victor Killen | TD |
| 7/16/21 | $252,500 | Victor's Trucking and Pull LLC | Victor Killen | Wells Fargo |
| 7/18/21 | $362,000 | [entity associated with Agbeyome and his relative] | | M&T |

These transactions and the associated checks were shown in the PNC 4286 records were

produced in discovery.   *See* USA-012465- USA-012470 (Production #1).

Beginning on or about July 14, 2021 and continuing throughout the month, Agbeyome

also sent money to a CashApp account with the username Papa Kwam.   *See* USA-012446 (BOA

Statement); *see also* Production #3, CashApp Return_PapaKwam_CashApp_Account.

Agbeyome controlled the Papa Kwam CashApp account.   *See id*.   The bank statements for PNC

4286 plainly showed the Cash App transfers:

| 07/06 | 10.00 | 0516 Debit Card Purchase Cash App*Papa Kwam* 8774174551 Ca | 690528490617205101105 |
| 07/06 | 6.00 | 0516 Debit Card Purchase Cash App*Papa Kwam* 8774174551 Ca | 696850495067205101105 |
| 07/14 | 4,000.00 | 0516 Debit Card Purchase Cash App*Papa Kwam* 8774174551 Ca | 003058920617205161505 |
| 07/16 | 3,500.00 | 0516 Debit Card Purchase Cash App*Papa Kwam* 8774174551 Ca | 048690930617205161597 |
| 07/21 | 50.00 | 0516 Debit Card Purchase Exxonmobil Silver Spr | 254560195061720551691102 |
| 07/21 | 400.00 | 0516 Debit Card Purchase Cash App* ____774174551 Ca | 254970193061720551612102 |
| 07/22 | 369.98 | 0516 Debit Card Purchase Southwes 800-4359792 | 872938935061720551612105 |
| 07/22 | 1,500.00 | 0516 Debit Card Purchase Cash App*Papa Kwam* 8774174551 Ca | 872985930617205161505 |
| 07/23 | 40.00 | 0516 Debit Card Purchase Shell Oil 57542187307 Bladensburg M | 972719190617205161504 |
| 07/26 | 400.00 | 0516 Debit Card Purchase Cash App*Papa Kwam* 8774174551 Ca | 852115950617205161697 |

USA-012446.

More than $350,000 from the Victim Trust fraud proceeds ended up being credited to a

Victors Trucking and Pull LLC account at Citi ending in 4494 ("Citi 4494"), which Victor Killen

controlled.   Killen later used Citi 4494 to send money to a Bank of America account ending in 0606 ("BOA 0606"), which Agbeyome controlled using the stolen identity of Identity Theft Victim #2, another real person.   *See* USA-045097, Production #1, Responses, Response 256 Bank of America.

In September 2021, the Victim Trust was fraudulently induced to send $1,176,158.89 to PNC 4286.   This deposit is shown on the PNC 4286 September statement produced in Production #1:

**Deposits and Other Additions**

**ACH Additions**

| Date posted | Amount | Transaction description | | Reference number |
|---|---|---|---|---|
| 09/02 | 1,176,158.89 | ACH Credit | ▇▇▇▇▇▇▇▇▇▇▇▇ | ████████████ |

USA-012451.   After receiving the funds, Agbeyome sent substantial funds to other places including more than $650,000 to accounts associated with Victor's Trucking and Pull LLC (Killen) and more than $500,000 to accounts associated with Vieta Collection (Harris).   USA-012471- USA-012474 (PNC 4286 cancelled checks) (Production #1).

Of the approximately $2.7 million in fraud proceeds that were laundered by the conspiracy, the financial records show Sowe received more than $450,000 into accounts he controlled. As an example, on or about August 13, 2021, Sowe caused a $75,000 check written on a Citi account ending in 4494 ("Citi 4494") to be deposited into a CO account ending in 8993 ("CO 8993"), which Sowe controlled through YS Estate and Properties LLC.   *See* USA-011386 (Production #1).   By the time Sowe received the fraud funds into CO 8993, the proceeds had been repeatedly layered, including through Citi 4494, a Truist account ending in 5211 ("Truist 5211"), which was registered to Vieta Collection and controlled by Harris, USA-014406 (Production #1) and PNC 4286, which was controlled by Agbeyome through a Shell Entity and stolen identity, USA-012417-12425 (Production #1).

33

On September 30, 2021, Sowe was lawfully arrested by law enforcement in Queen Anne's County, Maryland, following a traffic violation.   Sowe was the driver of the vehicle, and his wallet contained the debit card a PNC Vieta Collection account controlled by Harris and the PNC Justin Account controlled by Agbeyome.   *See* Production 7, Discovery by Transaction, 3a. Victim _____ July 2021, Oct 2022, 09302021 Queen Annes arrest SOWE.

As noted briefly above, in July 2021, Sowe exchanged WhatsApp messages with Osemwenkhae/Bro Fam about the Victim Trust fraud.   Sowe was using WhatsApp 6150 and the government contends that Osemwenkhae was using WhatsApp 6294, which was listed in Sowe's phone as "Bro Fam."   The WhatsApp chats come from Sowe's phone that was seized by the Montgomery County Police Department in December 2021 following the police involved shooting of Sowe's backseat passenger—after the decedent exited Sowe's car and attempted to shoot at law enforcement officers.   *See* Production #1, Electronic Images, SOWE and BOIRO, C2_06282409_Apple iPhone 12 Pro Max.   Federal agents later obtained a federal search warrant for the device.

These contemporaneous WhatsApp chats from Sowe's phone include references to the money arriving soon, a reference to 1.6, and then images from inside the PNC 4286 account that received approximately $1.5 million from the victim on or about July 13, 2021.   On July 12, 2021, WhatsApp 6294 sent Sowe the following message:   "We are expecting the funds to come in latest Wednesday," "So account for clearing has to be ready."   Sowe asked, "What account tho."   Osemwenkhae/BroFam wrote, "PNC," "The 1.6."   Sowe responded, "Ok Fosho." Then Sowe sent the address where he was then living:   789 ST Michaels Drive.   They also exchanged messages about moving some of the money through an M&T account ending in 8530

34

("M&T 8530"), which was registered to a relative of Agbeyome.   *See* Production #1, Electronic

Images, SOWE and BOIRO, C2_06282409_Apple iPhone 12 Pro Max.

In July 2021, Sowe used WhatsApp 6150 to exchange messages with Harris (using

WhatsApp 7146) about the money laundering related to the Victim Trust.   On July 22, 2021,

Sowe's WhatsApp 6150 sent Harris's WhatsApp 7146 an image of information for a business

account in China, as shown below:

```
TT PAYMENT LINE:
Intermediary Bank: WACHOVIA BANK ,N.A.  NEW YORK INTERNATIONAL BRANCH.
SWIFT BIC:PNBPUS3NNYC
Beneficiary Bank: BANK OF WEIFANG
SWIFT BIC: WFCRCNBN
ADD . NO.5139 EAST SHENGLI STREET,  WEIFANG , CHINA,  261041
ACCOUNT No.:  80216151462999053
Beneficiary:
NAME:  SHANDONG JINLI IMP AND EXP.CO.LTD
ADD.: HOUZHEN  SHOUGUANG  SHANDONG  CHINA 262724
TEL:83-536-5364057   FAX:86-536-5364057
```

Then he sent an amount:   "$52,000."   On July 22, 2021, Killen caused $52,000 to be sent from

Woodforest 4396 to the Bank of Weifang.   Also on July 22, 2021, Sowe instructed Harris to get

two cashier's checks for $95,000 and $72,000.   On July 22, 2021, Killen used funds from

Woodforest 4396 to purchase a cashier's check for $95,000, which was later deposited into Citi

4494.   On July 23, 2021, Harris purchased a cashier's check for $75,000, which was later

deposited into JPMC 1531.

In late July 2021, Sowe used Telegram 7217 to exchange messages with Harris (using

Telegram 6960) about the Victim Trust fraud proceeds.   Production #1, Electronic Images,

SOWE and BOIRO, C2_06282409_Apple iPhone 12 Pro Max.   On July 29, 2021, Sowe sent

Harris's cell phone an image of an online chat between Sowe and Osemwenkhae/Bro Fam that

included references to "Wells Fargo, Victor Trucking, 252,500, 100,000 Casher 2 Woodforst,

75,000 Cash, 70,000 wire China, 3,000 Cash."   Another message showed details about Weifang

Bank, sending a $100,000 wire from M&T Bank, and $9500 cash "For Ariel."




These amounts match transactions involved in the Victim Trust fraud, including $252,500 sent from PNC 4286 to a Wells Fargo account ending in 7361 ("Wells Fargo 7361").

In addition to information from cell phones associated with Sowe and Osemwenkhae, the government has cellular messaging evidence from other co-conspirators and individuals. Harris's cell phone contained WhatsApp communications with WhatsApp 6294, which was named D&G in Harris' phone, and which the government contends was controlled and used by Osemwenkhae.  *See* Production #1, Electronic Images, BA02RR21BA0001-HARRIS, CELL1. On or about August 6, 2021, Osemwenkhae used WhatsApp 6294 to forward Harris an image of a Wells Fargo online banking screen showing a check for $5,000, a withdrawal of $225,020, and a $1,000 CashApp to Parker.



*Id*.   These were transactions that occurred in July 2021 in WF 3335, and were reflected in the

July 2021 bank statement found in Production #1.   USA-016402.   On or about August 6, 2021,

Harris responded through WhatsApp "Okay."

On or about September 1, 2021, Sowe (using WhatsApp 6150) and Gift/Bro Fam (again

using WhatsApp 6294) exchanged messages about the second part of the Trust fraud.   On

September 1, 2021, Sowe used WhatsApp 6150 to ask Osemwenkhae whether "You want ours to

do Justin's mom's joint she give out erryting for the account."   Production #1, Electronic

Images, SOWE and BOIRO, C2_06282409_Apple iPhone 12 Pro Max.   A little over an hour

later, Osemwenkhae used WhatsApp 6294 to tell Sowe:   "1.176m rebound coming in

tomorrow."   This closely matches the fraud funds deposited into PNC 4286 on or about

September 2, 2021.

On September 2, 2021, Osemwenkhae's WhatsApp 6294 sent a message to Harris's

WhatsApp 7146 that simply read "Ariel."   The next message stated:



On September 7, 2021, Sowe and Harris continued to communicate via Telegram.   Sowe

used Telegram 7217 to send Harris the following messages, which included screen shots of his

communications with Osemwenkhae/Bro Fam:





Production #1, Electronic Images, SOWE and BOIRO, C2_06282409_Apple iPhone 12 Pro

Max.   These amounts match money laundering transactions that were part of the Victim Trust

fraud proceeds per the bank records produced in Production #1.

## ARGUMENT

I.    **The Money Laundering Conspiracy Is Sufficiently Alleged (ECF No. 148).**

The money laundering conspiracy charge in Count One of the Indictment and the Superseding Indictment meets the very minimal requirements for pleading a federal offense because it alleges the essential elements of the offense, permits the defendants to prepare a defense, and permits the defendants to plead double jeopardy in any future prosecution for the same offense.    *See United States v. American Waste Fiber Co.*, 809 F.2d 1044, 1047 (4th Cir. 1987).

Osemwenkhae's arguments in support of dismissal and/or a bill of particulars rely upon gross mischaracterizations of the money laundering conspiracy, including but not limited to a failure to recognize that when "DEFENDANTS" are referenced repeatedly throughout Count One, Osemwenkhae is one of the DEFENDANTS.    Moreover, contrary to the entire thrust of the Defendant's motion to dismiss, the government is not required to set forth in the indictment the acts of a defendant—especially when a conspiracy not requiring any overt acts is charged—nor does the charging document need to lay out all the evidence the government intends to introduce at trial to establish a defendant's participation in the conspiracy.

Because Osemwenkhae has filed a motion to dismiss, this Court's focus should be on the elements of the charged offense and whether those have been pled.    Because Count One was properly pled, the motion to dismiss and/or for a bill of particulars should be denied.    In the alternative, as set forth below, even if this Court were to otherwise consider ordering a bill of particulars based on the charging document alone, the discovery in this case sufficiently provides the defendant with additional notice so as to render unnecessary a bill of particulars.

### A.     There Are Very Minimal Pleading Requirements For A Money Laundering Conspiracy.

It is well settled that an indictment does not need to list every act of every defendant in furtherance of a conspiracy.   Instead, the indictment merely needs to allege the essential elements of a charged crime so it permits a defendant to prepare a defense and plead double jeopardy in any future prosecution for the same offense.   *See Hamling v. United States*, 418 U.S. 87, 117 (1974); *American Waste Fiber Co.*, 809 at 1047; *United States v. Hooker*, 841 F.2d 1225, 1227 (4th Cir. 1988).   The Federal Rules of Criminal Procedure are consistent with this low pleading standard, stating that an indictment merely needs to contain "a plain, concise, and definite written statement of the essential facts constituting the offense charged[.]"   Fed. R. Crim. Proc. 7(c)(1).   Put another way, an indictment is valid if it "(1) allege[s] the essential facts constituting the offense; (2) allege[s] each element of the offense, so that fair notice is provided; and (3) [is] sufficiently distinctive that a verdict will bar a second prosecution for the same offense."   *United States v. Bolden*, 325 F.3d 471, 490 (4th Cir. 2003) (citations omitted).   As the Fourth Circuit bluntly put it in *Bolden*, "[a]s a basic proposition, an indictment is sufficient 'if it alleges an offense in the words of the statute.'"   325 F.3d at 490 (quoting U*nited States v. Brandon,* 298 F.3d 307, 310 (4th Cir. 2002); *United States v. Wicks,* 187 F.3d 426, 427 (4th Cir. 1999)).   If an indictment meets this standard, then a motion for dismissal and/or a bill of particulars should be denied.   *See United States v. Butler*, 885 F.2d 195, 199 (4th Cir. 1989); *United States v. Jackson*, 757 F.2d 1486, 1491 (4th Cir. 1985).

The minimal pleading requirements for Count One against Osemwenkhae are especially apparent because the relevant conspiracy statute, 18 U.S.C. § 1956(h), requires no overt act.   *See Bolden*, 325 F.3d at 491 (a "money laundering conspiracy, pursuant to 18 U.S.C. § 1956(h), . . . does not require an overt act to be either alleged or proven," so the failure to allege particular acts

cannot be a deficiency in the charge); *see also United States v. Ravenell*, 66 F.4th 472, 481 (4th Cir. 2023) ("The Supreme Court, however, has clearly held that "conviction for conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h), does not require proof of an overt act in furtherance of the conspiracy.").

In *Bolden*, the Fourth Circuit considered the sufficiency of a money laundering charge under Section 1956(h) in the context of a complicated health care fraud scheme leading to fraud and money laundering charges. On appeal after being convicted at trial, the defendants claimed that the money laundering conspiracy charge was facially deficient due to alleged lack of specificity, including about particular acts by the defendants. The Fourth Circuit rejected all of the defendants' challenges to the money laundering conspiracy, in particular, the request for more information about overt acts by a particular defendant, which the Court characterized as "baseless." 325 F.3d at 491.

Thus, the specific acts or overt acts that Osemwenkhae complains about are not legally required to prove a money laundering conspiracy offense and cannot form the basis for an alleged pleading deficiency. As the Fourth Circuit reasoned in *Ravenell* when rejecting a defense argument that there had to be an overt act proven at trial within the statute of limitations period in a money laundering conspiracy:

> Section 1956(h) conspiracy offenses require nothing more than an agreement to launder money," and thus "it follows that the agreement is necessarily the 'conduct' making up the offense." *United States v. Ojedokun*, 16 F.4th 1091, 1105 (4th Cir. 2021). In other words, non-overt act conspiracies "do[ ] not make the doing of any act other than the act of conspiring a condition of liability." *United States v. Shabani*, 513 U.S. 10, 13–14, 115 S.Ct. 382, 130 L.Ed.2d 225 (1994) (internal quotations omitted).

*Ravenell*, 66 F.4h at 481.

Nor are the allegations as to this money laundering conspiracy or as to Osemwenkhae's

participation in it vague so as to require a bill of particulars.   The indictment describes the money laundering conspiracy and how it worked in many respects.   No more is required.   *See Bolden,* 325 F.3d at 491; *Wong Tai v. United States*, 273 U.S. 77, 81 (1927) ("It is well settled that in an indictment for conspiring to commit an offense-in which the conspiracy is the gist of the crime-it is not necessary to allege with technical precision all the elements essential to the commission of the offense which is the object of the conspiracy"); see *also United States v. Ojedokun*, 16 F.4th 1091, 1105 (4th Cir. 2021) (Since "§ 1956(h) conspiracy offenses require nothing more than an agreement to launder money, it follows that the agreement is necessarily the 'conduct' making up the offense," and was sufficient that defendant "agreed with multiple coconspirators to arrange financial transactions intended to disperse and disguise the proceeds of the U.S.-based fraud scheme"); *United States v. Threadgill*, 172 F.3d 357, 367 (5th. Cir. 1999) (rejecting challenge to 1956(h) indictment language because "the wording of the charge [wa]s sufficiently specific to apprise the defendants of the charged crime, and to protect them from subsequent prosecution for the same offense," and the elements of a 1956(h) conspiracy are different then for underlying substantive money laundering offenses); *United States v. Green*, 599 F.3d 360, 373 (4th Cir. 2010) (discussing money laundering conspiracy promotion and concealment).

The government submits that at bottom Osemwenkhae is not confused about the nature of the charges against him, but instead seeks details about the evidence that will be *introduced at trial* to prove the alleged money laundering conspiracy.   But a bill of particulars, or complaints about the alleged vagueness of an indictment, are not meant to address counsel's desire for a reverse proffer, details about the defendant's statements that will be introduced at trial, any acts in furtherance of a conspiracy that the government might seek to introduce at trial, nor information about cooperators.   This is because it is well settled in this Circuit that a "bill of particulars is not

to be used to provide detailed disclosure of the government's evidence in advance of trial." *United States v. Automated Medical Labs., Inc.*, 770 F.2d 399, 405 (4th Cir. 1985). A bill of particulars serves merely to provide a defendant with notice of charges and to interpose a plea of double jeopardy should he be prosecuted a second time for the same offense. *See United States v. Torres*, 901 F.2d 205, 234 (2d Cir. 1990); *United States v. Schembari*, 484 F.2d 931, 934-35 (4th Cir. 1973); *United States v. Bin Laden*, 92 F. Supp. 2d 225, 233 (S.D.N.Y. 2000).

A bill of particulars is only necessary if the indictment fails to apprise a defendant of the charges and additional detail is necessary to avoid unfair surprise. *See American Waste Fibers Co.*, 809 F.2d at 1047. A bill of particulars is not meant to be a substitute for a defendant's review of discovery and his duty to prepare for trial. *See Automated Medical Labs*, 770 F.2d at 405. A motion for a bill of particulars should not be permitted merely for the defense to obtain a "detailed disclosure of the Government's evidence in advance of trial." *Id*. Numerous decisions from Judges of this Court are in keeping with these principles. *See, e.g., United States v. Verzaleno*, 2024 WL 342086, *5 (D. Md. July 16, 2024) (Chasanow, D.J.) (rejecting defendants' motion for a bill of particulars in a complicated wire and mail fraud scheme despite defendant's complaint the indictment "lack[ed] detail," he was "never described doing anything, except getting money," and that his role was "otherwise unclear," because the indictment sufficiently alerted the defendant that he was "alleged to have been part of the group that devised the scheme to defraud, to have received a portion of the kickbacks in cash in person, and to have made a secret arrangement" to send false invoices); *United States v. Johnson*, 2011 WL 6202847, at *7–8 (D. Md. Dec. 7, 2011) (denying a motion for a bill of particulars, which should not be used for a detailed disclosure of the government's trial evidence, where the defendant's bill of particulars request focused on the government's anticipated evidence at trial, including a description of the particular drug

43

transactions the defendant facilitated, participated in, or was present for, and details about the defendant's statements in furtherance of the conspiracy).

  **B.**   **The Money Laundering Conspiracy Alleged Against Osemwenkhae and His Co-Defendants Contains Many Detailed Allegations About How The Conspiracy Operated.**

  Osemwenkhae's motion also should be denied because it fails to acknowledge and recognize key aspects of the money laundering conspiracy, as alleged in the original Indictment and now in the Superseding Indictment.

  Count One alleges that Osemwenkhae participated in a money laundering conspiracy because the co-conspirators formed an illegal agreement to conduct and attempt to conduct financial transactions involving the proceeds of a specified unlawful activity, that is wire fraud, with the intent to promote the carrying on of a specified unlawful activity or knowing that the transactions were designed to conceal and disguise the nature, location, source, ownership, and control of the specified unlawful activity. Paragraph 3 of Count One lists particular frauds that generated the fraud proceeds involved in the money laundering conspiracy. Count One describes the applicable time period of the conspiracy, describes at least fourteen members of the conspiracy by name, and alleges that the purpose of the conspiracy was in part for the co-conspirators to personally enrich themselves.

  Count One also describes how Shell Entities were created that lacked legitimate business activities, how the members of the conspiracy opened and controlled bank accounts associated with the Shell Entities, and how stolen identities were used in furtherance of the conspiracy. ECF 153 at 6-7. Seventeen different Shell Entities associated with the money laundering conspiracy are specifically listed in Count One. This is particularly significant because the Fourth Circuit has held that "[t]he creation and use of sham businesses is highly relevant to the proof of

concealment money laundering," which is part of the alleged conspiracy.  *Bolden*, 325 F.3d at 490.

Count One described how the co-conspirators' bank accounts and Cash App accounts were used to "receive money originating" with the fraud victims.  ECF 153 ¶ 21.  Count One went further than merely alleging an illegal agreement—it discussed how the co-conspirators "engaged in financial transactions with proceeds from wire fraud schemes, including frauds in which victims were deceived into sending money based on false and fraudulent pretenses, such as being provided with false bank account information for legitimate vendor payments and false wire transfer information for legitimate transactions." ECF 153, ¶ 22. Count One also listed particular bank accounts (by number) through which the fraud proceeds flowed in furtherance of the money laundering conspiracy.  *See* ECF 153, ¶ 24.

The money laundering conspiracy also involved co-conspirators providing "false and fraudulent information to financial institutions," ECF 153 at ¶ 26. Count One discussed how the members of the conspiracy "communicated through encrypted online communication applications" ECF 153, ¶ 28, and "obtained and used a portion of the money," ECF 153, ¶ 29. These are just some of the very detailed allegations about how the alleged money laundering conspiracy operated that Osemwenkhae's motion blithely ignores.

Moreover, Osemwenkhae incorrectly asserts that the indictment merely alleged he was a resident of Maryland, participated in the conspiracy, and controlled a shell entity.  ECF 148 at 1- 2.  As mentioned earlier, Osemwenkhae is one of the "DEFENDANTS," and is thus alleged to have done many other things as part of his participation in the conspiracy.  Read as such, Count One alleges that Osemwenkhae personally engaged in a host of activities.

Finally, although the Superseding Indictment was filed on the same day when

Osemwenkhae filed his motion to dismiss, and thus Osemwenkhae had not reviewed it when he filed his motion, the Superseding Indictment alleges over 20 individual acts of money laundering as to Osemwenkhae that further puts him on notice as to the nature of the charges against him, including in Count One.   *See* ECF 153 at 12-15.[8]

Reviewed on the whole, it is plain that the money laundering conspiracy in Count One sufficiently alleges the charged offense.   It sets forth the elements of the offense charged, lists victims, lists particular bank accounts, and describes in multiple common-sense, plain English allegations how the conspiracy actually worked.   Accordingly, this Court should deny the motion to dismiss and/or for a bill of particulars.

### C.    The Extensive Discovery, Including Discovery Organized By Fraud Victim, Further Demonstrates That No Bill Of Particulars Is Appropriate.

Alternatively, even if the indictment failed to convey sufficient information, a bill of particulars would still be unwarranted here because of the particularized discovery provided to Osemwenkhae through his attorney.   The particularized discovery in this case cures any insufficiency and voids any need for a bill of particulars.   Indeed, courts are encouraged to consider the information available to the defense outside the indictment when considering whether to grant a motion for a bill of particulars.   As a leading treatise puts it: "If the needed information is in the indictment, then no bill of particulars is required.   The same result is reached if the government has provided the information called for in some other satisfactory form."   1 C. Wright, FEDERAL PRACTICE AND PROCEDURE: CRIMINAL 5129 at 437 (1982); *see also United States v. Soc'y of Indep. Gasoline Marketers*, 624 F.2d 461, 466 (4th Cir. 1979);

---

[8]    Such transaction specific information greatly diminishes Osemwenkhae's claims that he lacks notice *regarding his particular illegal acts.   See United States v. Ali*, 735 F.3d 176, 193 (4th Cir. 2013) (rejecting alleged lack of specificity in a money laundering conspiracy due to descriptions of particular transactions elsewhere in the indictment).

*United States v. Giese,* 597 F.2d 1170, 1180-1181 (9th Cir. 1979) (full disclosure obviates the need for a bill of particulars).

Thus, any omissions or deficiencies in the money laundering conspiracy pleading may still be found to have been remedied by the extensive and detailed discovery productions provided to Osemwenkhae.   As Judge Hollander has held, "Detailed discovery may obviate the need for a bill of particulars.   Therefore, when considering whether to grant a defendant's motion for a bill of particulars, it is appropriate for the district court to inquire about the information that has already been provided by the government during discovery."   *United States v. Blair*, No. ELH-19-00410, 2021 WL 424411, at *3 (D. Md. Feb. 5, 2021); *see also United States v. Blanchard*, 542 F.3d 1133, 1140 (7th Cir. 2008) (bill of particulars unnecessary if preparation of defense possible due to another process, such as discovery); *United States v. Godfrey*, No. 11-10279-RWZ, 2013 WL 1414887, at *3 (D. Mass. Apr. 5, 2013) (denying bill of particulars in part because discovery was provided in searchable format).   Accordingly, even if there were any omissions in the phrasing of the money laundering conspiracy count, this Court is well within its authority to find that such concerns have been remedied through the discovery productions in this case.

Here, as detailed above, the government has provided extensive discovery.   And a motion to dismiss and/or for a bill of particulars should not be used in lieu of reviewing the discovery.   The discovery provided Osemwenkhae with ample notice of the full evidence, and read in combination with the victims and bank accounts in Count One, Osemwenkhae's counsel could follow the money like the agents did from the fraud victims to the Defendants and their co-conspirators.   Moreover, in Production 7 the government provided Osemwenkhae with significant discovery (much of it previously provided) organized by fraud victim, and with

common sense folders such as bank records, victim information, etc.   Production 7 also included material such as Agent-prepared link charts plainly showing the movement of money at heart of this money laundering conspiracy case.   Production 7 focused on the victims in the original indictment, but the government intends to make a similar production in the future regarding the newly identified victims in the Superseding Indictment.   Accordingly, in light of the voluminous discovery and the attempts to organize that discovery in a user friendly manner for defense counsel, there is no need for a bill of particulars.   *See United States v. Fauntleroy*, 800 F. Supp. 2d 676, 689 n.8 (D. Md. 2011) (Legg, J.) (emphasizing the lack of a "need for a bill of particulars in a case such as this, in which the Government has provided extensive pretrial discovery putting the Defendants on notice of the specific nature of the charges against them.").

Finally, the Superseding Indictment also contains specific counts as to Osemwenkhae, further reducing the likelihood that he cannot determine the relevant transactions and conduct. Collectively, the charging documents and the particularized discovery overcome any need for a bill of particulars.   They provide the Defendant and his counsel with a catalog and roadmap of the evidence against him.   To the extent that counsel complains that the money laundering conspiracy involves a lot of transactions, bank accounts, entities, encrypted communications, and co-conspirators—that is not the fault of the government.   To the contrary, the bearer of blame here is Osemwenkhae, who engaged in over four years of wide-ranging criminal activity.

**D.    This Court Should Be Leery Of Ordering A Bill Of Particulars Because It Necessarily Constrains the Government's Proof At Trial.**

Because a bill of particulars confines the government's proof to the particulars furnished, it should not be granted lightly as it will greatly prejudice the government by restricting its ability to present proof at trial.   *See United States v. Murray*, 297 F.2d 812, 819 (2nd Cir. 1962);

48

*United States v. Rainieri*, 91 F.R.D. 159, 160-61 (W. D. Wis. 1980); *United States v. Carfaro*, 480 F. Supp. 511, 517 (S.D.N.Y. 1979); *United States v. Anderson*, 368 F. Supp. 1253, 1263 (D. Md. 1973) ("Premature exposure and unnecessary confinement of the Government's case are certainly significant factors in a court's consideration of particulars.").

Moreover, a bill of particulars should not be used for a preview of the government's evidence at trial or to permit the defense to test the legal theories underlying the government's case. *See United States v. Barnes*, 158 F.3d 662, 665-66 (2d Cir. 1998); *United States v. Hsia*, 24 F. Supp. 2d 14, 30 (D.D.C. 1998) ("A bill of particulars properly includes clarification of the indictment, not the government's proof of its case."); *United States v. DeSalvo*, 797 F. Supp. 159, 174-75 (E.D.N.Y. 1992) (motion for bill of particulars should be denied where "defendant seeks in detail the sort of arguments that the government will make to bolster its arguments."). When, as here, a money laundering conspiracy has been properly pled under applicable caselaw and Fed. R. Crim. P. Rule 7(c), "[a] bill of particulars is not to be used to provide detailed disclosure of the government's evidence in advance of trial." *Automated Med. Lab., Inc.*, 770 F.2d at 405.

Thus, the test this Court should apply in considering the defendant's motion is not whether the more information would useful to the defense, but whether dismissal or a bill of particulars is legally required. *See United States v. Sherriff*, 546 F.2d 604, 605 (5th Cir. 1977). Here, this Court should find no bill of particulars required, and should not unnecessarily confine the government's proof at trial by requiring a bill of particulars.

## II.    The Defendant's Motion To Suppress Evidence Obtained Pursuant To A Federal Search Warrant From The Defendant's Residence Should Be Denied (ECF 149).

Osemwenkhae moves to suppress the evidence seized from the Stanwich Residence and does not contest the searches of his person and his vehicle, the probable cause for which was

contained in the same affidavit that predicated the search of the Stanwich Residence.  *See* ECF 149.  Osemwenkhae challenges the search on a single narrow ground, arguing that the affidavit did not establish probable cause to believe he lived and used the Stanwich Residence.[9]

This Court should deny Osemwenkhae's Motion to Suppress for at least three independently sufficient reasons.  *First*, if the Court accepts Osemwenkhae's assertions as true, Osemwenkhae lacks standing to contest the search of the Stanwich Residence.  Osemwenkhae devotes the entirety of his Motion to disavowing his connection to the Stanwich Residence and thereby forfeits any expectation of privacy.  Thus, absent a showing by Osemwenkhae of a cognizable privacy interest in the Stanwich Residence, the Court should deny the Motion to suppress.  *Second*, even assuming Osemwenkhae has standing, his Motion fails because there was ample probable cause to search the Stanwich Residence, and equally ample probable cause to believe Gift lived at and used the Stanwich Residence.  *Third*, even if probable cause was lacking, law enforcement relied in good faith on the warrant and the search of the Stanwich Residence stands.

### A.    Osemwenkhae Lacks Standing to Challenge the Search of the Stanwich Residence

As an initial matter, taking Osemwenkhae's proffered version of the facts, Osemwenkhae lacks standing to oppose the search of the Stanwich Residence because he has forfeited his privacy interest by denying occupancy, ownership, and arguing that he was only at the residence

---

[9]    In his introduction, Osemwenkhae asserts that the affidavit "(1) lacked probable cause; (2) was overbroad, and (3) lacked a sufficient nexus between the place to be searched and the alleged criminal conduct."  ECF 149 at 1.   But the challenges Gift asserts in his introduction differ from what he actually provides factual and legal argument for in his Motion. Argument concerning overbreadth and nexus are completely absent. Searches and seizures conducted pursuant to a search warrant, as here, are presumed valid, and the burden rests on the defendant to contest its validity.

four discrete times. ECF 149 at 3.   "Fourth Amendment rights are personal, which means that a defendant can mount a Fourth Amendment challenge only if he has his own cognizable Fourth Amendment privacy interest in the invaded space."   *United States v. Green*, 106 F.4th 368, 375 (4th Cir. 2024).   Thus, whether a defendant has standing to contest the validity of a search and seizure under the Fourth Amendment turns upon whether the defendant had "a legitimate expectation of privacy in the invaded place."   *Rakas v. Illinois*, 439 U.S. 128, 143 (1978).   "In order to demonstrate a legitimate expectation of privacy [a defendant] must have a subjective expectation of privacy, and that subjective expectation must be reasonable."   *United States v. Ferebee*, 957 F.3d 406, 412 (4th Cir. 2020) (quoting *United States v. Bynum*, 604 F.3d 161, 164 (4th Cir. 2010).

Osemwenkhae disavows ownership and occupancy in the Stanwich Residence multiple times throughout his Motion.   *See* ECF 149. at 3 ("In sum, the affidavit presents evidence that Mr. Osemwenkhae and/or his alleged car were at the residence on three occasions (photographs from 2/2/23 and 1/11/24 and the April 2023 Instagram photo), and a claim that they observed him at the residence a total of four times. That is all."); *id*. at 6 ("The mere fact that law enforcement claimed to observe Mr. Osemwenkhae at a residence of which his mother was the legal owner a total of four times is not sufficient to establish probable cause that Mr. Osemwenkhae actually resided at that location."); *id*. (". . . the Court simply had an insufficient basis to make a finding on the scant evidence offered that there was probable cause to believe that Mr. Osemwenkhae resided at the house."); *id*. ("An individual observed at a residence a total of four times, particularly the residence of his mother, could just as likely be a visitor.").

Like most circuits, the Fourth Circuit treats disavowals of ownership and disclaimers, like the one here, "as an abandonment of the property" for the purposes of challenging a search.

51

*Ferebee*, 957 F.3d at 413.   In evaluating ownership disclaimers, the inquiry "turns on the intent of the defendant as revealed through his words or actions." *Id*. at 413–14.   Here, Osemwenkhae's words are unequivocal.   Osemwenkhae repeatedly disputes any ownership, occupancy, and interest in the Stanwich Residence and thereby forfeits his right to challenge the search.   He admits to only being at the residence four discrete times.   In taking this position, Osemwenkhae abandons his subjective privacy interest in the Stanwich Residence.

        Moreover, to the extent Osemwenkhae argues that his connection to the Stanwich Residence was that of a visitor, then Osemwenkhae "has the burden of establishing that he is the *kind* of visitor who has an objectively reasonable expectation of privacy in a residence that is not his own."   *Green*, 106 F.4th at 375.   In *Green*, the Fourth Circuit held the defendant had a reasonable expectation of privacy in his cousin's residence as a social guest after the cousin testified at a suppression hearing that the defendant: (1) was a long-time and regular guest in his home; (2) visited once or twice a week for the past three or four years; (3) socialized in the residence with the cousin; (4) had permission to move about the home freely; and (5) sometimes brought friends with him when he visited.   *Id*. at 373.   The Fourth Circuit viewed these facts as establishing the "degree of acceptance into the household that generates a reasonable expectation of privacy for a social guest."   *Id*. at 376 (internal citations omitted).   But, based on Osemwenkhae's assertions, his circumstances are unlike those in *Green*.   Osemwenkhae contends that he only visited the residence four discrete times between 2023 and 2024, making him an infrequent and transactional visitor.   Accordingly, there is no way Osemwenkhae's circumstances (as he claims them to be) give rise to the "degree of acceptance into the household that generates a reasonable expectation of privacy for a social guest."

        Because of Osemwenkhae's disavowal of the Stanwich Residence, Osemwenkhae lacks

standing to contest the search.   This should end the inquiry—full stop.   To the extent

Osemwenkhae argues that he has standing as a visitor, Osemwenkhae then bears the burden of

demonstrating that he is the type of visitor that is entitled to an expectation of privacy.   To this

end, *Green* is instructive, and Osemwenkhae ought to produce the owner of the property to

testify to facts that tend to show that he had an expectation of privacy in the residence.

> **B.      Even Assuming Osemwenkhae Has Standing, There Was Probable Cause to
> Search the Stanwich Residence for Evidence of Osemwenkhae's Crimes.**

Even assuming Osemwenkhae has standing to contest the search of the Stanwich

Residence, his Motion still fails.   The affidavit set forth more than an ample basis for the Court

to find probable cause that evidence, fruits, and instrumentalities of the subject offenses would

be located within the Stanwich Residence.   The affidavit robustly established Osemwenkhae's

connection to the Stanwich Residence and provided a substantial basis to believe evidence of his

crimes would be located there.

> **1.   The Affidavit Demonstrated Probable Cause to Believe That
> Osemwenkhae Lived at the Stanwich Residence**

Osemwenkhae argues that the evidence seized from the Stanwich Residence must be

suppressed because the affidavit lacked probable cause to believe Osemwenkhae lived at the

residence.   ECF 149 at 6–9.   He argues that the affidavit contained "scant evidence" to believe

Osemwenkhae lived at the Stanwich Residence.   ECF 149 at 6.   Nothing could be farther from

the truth.   The affidavit supplied more than ample probable cause to believe Osemwenkhae lived

at the Stanwich Residence.

Probable cause is "not a high bar," *United States v. Blakeney*, 949 F.3d 851, 859–61 (4th

Cir. 2020), and "exists where the known facts and circumstances are sufficient to warrant a man

of reasonable prudence in the belief that contraband or evidence of a crime will be found,"

*Ornelas v. United States*, 517 U.S. 690, 696 (1996).   In at least three different ways, Special

Agent Rusakiewicz identified specific facts and circumstances that showed a fair probability that

Osemwenkhae lived at and used the Stanwich Residence.

  *First*, law enforcement physically surveilled the Stanwich Residence at least four

different times between 2023 and 2024 and captured either Osemwenkhae or his Mercedes Benz

at the residence each time.   In fact, on January 30, 2024—two days before Judge Aslan signed

the search warrant—law enforcement surveilled the Stanwich Residence and captured

Osemwenkhae's vehicle parked in the driveway. This alone is sufficient to establish probable

cause.   *See United States v. McNeal*, 818 F.3d 141, 151 (4th Cir. 2016) (finding the search

warrant affidavit contained probable cause to believe McNeal lived at the residence after FBI

agents witnessed him leaving the residence twice).   *Second*, law enforcement obtained a search

warrant for the historical cell site information for Gift's cell phone in December 2022—only

about two months after surveillance captured Gift's vehicle waiting to exchange an

approximately $400,000 check with Trump.   The location data showed "numerous hits" in the

vicinity of the Stanwich Residence, which in combination with the physical surveillance, made it

fairly probable that Gift was living at the Stanwich Residence since at least December 2022.

*Third*, Gift's residency at the Stanwich Residence was further supported by a social media post

from April 2023 showing Gift at the Stanwich Residence with his Mercedes Benz parked in the

garage.

  Therefore, based on the totality of the circumstances, Judge Aslan had more than a

substantial basis to find it fairly probable that Osemwenkhae was residing at the Stanwich

Residence.   Resisting this conclusion, Osemwenkhae relies on *United States v. Brinkley*, which

he contends counsels the opposite conclusion.   *Brinkley*, however, is inapposite.   *Brinkley*

involved a *Payton* violation, where officers barged into a third-party home without a search

warrant, and on the simple belief that their subject, whom they had an arrest warrant for, was in

the residence based on the mannerisms of the individual who answered the door.   *Brinkley*, 980

F.3d at 381–84.   The *Brinkley* Court faulted law enforcement for not engaging in additional

investigation to bolster their belief that the subject lived at the third-party residence, such as by

conducting physical surveillance. *Id*. at 387–88.

      *Brinkley* is nothing like the case at hand.   *First*, *Brinkley* is legally distinguishable. As

mentioned above, *Brinkley* was decided under *Payton v. New York*, 445 U.S. 573 (1980), which

has an entirely different standard and framework than a search warrant because it involves

intrusions into homes based on *arrest warrants*. Under *Payton*, law enforcement may only enter

a residence with an *arrest warrant* if they have reason to believe: "(1) that the location is the

defendant's residence and (2) that he will be home when they enter." *Brinkley*, 980 F.3d at 384

(internal citations omitted) (cleaned up).   That is not the test for search warrants.   The test is

whether there is a fair probability to believe evidence of the alleged offenses will be found at the

location to be searched. *United States v. Mihelich*, 334 F. App'x 555, 556 (4th Cir. 2009) ("The

crucial element determining probable cause is 'whether it is reasonable to believe that the items

to be seized will be found in the place to be searched.'") (quoting *United States v. Lalo*r, 996

F.2d 1578, 1582 (4th Cir.1993)).

      *Second*, *Brinkley* is factually distinguishable. Unlike *Brinkley* where police had only an

arrest warrant (and hence were subject to *Payton*'s limits), here, agents obtained a federally

authorized search warrant for the Stanwich Residence and supported that warrant with a

supporting affidavit demonstrating overwhelming probable cause.   Law enforcement conducted

rounds of surveillance and obtained the location information for Osemwenkhae's cell phone,

placing him at or near the residence for an extended period.    In fact, law enforcement even surveilled the Stanwich Residence just two-days before the search warrant was signed and observed Osemwenkhae's vehicle parked in the driveway.    Thus, the affidavit clearly establishes that the agents here engaged in exactly the type of "further investigation" the *Brinkley* Court noted that police often conduct to "obtain recent, eyewitness evidence connecting the suspect to the residence." *Brinkley*, 980 F.3d at 388 (internal quotations omitted).

Yet, despite the mountain of evidence linking Osemwenkhae to the residence and supporting probable cause to believe that evidence would be found there, including ample evidence supporting Osemwenkhae's actual residency at the Stanwich Residence, such as recent "eyewitness evidence," Osemwenkhae insists that probable cause is still lacking.    According to Osemwenkhae, had agents only gone through the trash or peeked at the mail, would they then have been able to develop probable cause.    ECF 149 at 7.    For obvious reasons, this argument fails.    "The Fourth Amendment . . . does not require investigators to exhaust every potential avenue of investigation before seeking and obtaining a warrant." *McNeal*, 818 F.3d at 151; *see also United States v. Orozco*, 41 F.4th 403, 410 (4th Cir. 2022) (a warrant affidavit need not "close every inferential loop.") (cleaned up).    There is more than one way, and, in fact, much better ways of establishing where an individual lives than mail covers and trash pulls.    For example, physical surveillance, like what Special Agent Rusakiewicz conducted here.    Indeed, even if agents had performed a trash pull or mail cover, it is unclear how this information would have aided the probable cause determination given the surveillance findings.

Next, Osemwenkhae argues that the affidavit is "plainly deficient" because it neglects information concerning the residence he "legally" and "actually owned."    ECF 149 at 7. Repeatedly throughout his motion, Osemwenkhae faults the government for turning a blind eye

to this alleged fact and urging the magistrate to "ignore this evidence."  *Id.*   This argument fails

on at least two levels.  *First*, this information is irrelevant to probable cause because the four-

corners of the affidavit were plainly sufficient.  *Second*, law enforcement had no way of

knowing Osemwenkhae was the "actual" or "legal" owner of this other residence because

property records show that Osemwenkhae is not the owner. Someone else is.  *See* Ex. 1

(Property Record).   Therefore, Osemwenkhae's representations to the Court are either false and

misleading or Osemwenkhae really is the owner, and the property record reflects a straw

purchaser that Osemwenkhae used to conceal his unexplained wealth—just as Special Agent

Rusakiewicz suspected with the Stanwich Residence.

Accordingly, there was ample probable cause to believe that Osemwenkhae lived at the

Stanwich Residence, and Judge Aslan had a substantial basis in finding so.

> **2.  The Affidavit Established a Sufficient Nexus Between the Stanwich
>      Residence and the Items to be Seized.**

Having established probable cause to believe Osemwenkhae lived at the Stanwich

Residence, there was more than a sufficient basis to search the Stanwich Residence for evidence

of the Osemwenkhae's offenses.

The judge reviewing the warrant application is required "simply to make a practical,

common-sense decision whether, given all the circumstances set forth in the affidavit before him,

. . . there is a fair probability that contraband or evidence of a crime will be found in a particular

place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). "[T]he nexus between the place to be

searched and the items to be seized may be established by the nature of the item and the normal

inferences of where one would likely keep such evidence." *United States v. Lewis*, 733 F. App'x

83, 85 (4th Cir. 218) (quoting *United States v. Doyle*, 650 F.3d 460, 471 (4th Cir. 2011)); *United

States v. Grossman*, 400 F.3d 212, 217 (4th Cir. 2005) (explaining that magistrate judges may

draw reasonable inferences from the facts stated if the affiant does not assert facts "directly linking the items sought to the defendant's residence.") (internal quotation marks omitted).

Here, as described above, the affidavit established that Gift had committed money laundering by using an electronic device to communicate with his co-conspirator over WhatsApp about financial transactions that were undertaken to layer proceeds and insulate the money from victims. The affidavit detailed the incriminating nature of the WhatsApp messages and how the messages matched financial transactions in each of the three enumerated frauds. The affidavit also included pictures of banking documents and records of financial transactions that Gift and Trump shared over WhatsApp. The affidavit also explained that Special Agent Rusakiewicz had experience in similar investigations and had found bank documents, receipts, "documents reflecting the purchase of assets, personal calendars, check books, utility records, and notes" inside electronic devices ECF No. 149-1 at ¶ 63. Indeed, these are precisely the type of records the search warrant sought to seize, and, therefore, Osemwenkhae's conclusory claim that the search warrant was overbroad holds no merit.

Because one would normally expect electronic devices, bank records, receipts, and other similar records sought by the warrant to be found at a defendant's home, there was a fair probability that items sought by the warrant would be found at his residence. *See United States v. Sueiro*, 59 F.4th 132, 140 (4th Cir. 2023) (finding it reasonable to infer that evidence of a crime committed electronically would be found on electronic devices at a defendant's residence); *United States v. Bosyk*, 933 F.3d 319, 325–326 (4th Cir. 2019); *United States v. Farmer*, 370 F.3d 435, 439 (4th Cir. 2004) (explaining that documents like records of payment, checks, and payment receipts are not ordinarily destroyed or moved from place to place); *United States v. Freeman*, 685 F.2d 942, 949 (5th Cir. 1982) ("Passports, personal identification, and bank

records are precisely the sorts of items which people tend to keep at home among their personal papers and effects."); *United States v. Siddiqi*, No. 06 CR. 377 SWK, 2007 WL 549420, at \*8 (S.D.N.Y. Feb. 21, 2007) ("[I]t is reasonable to infer that [the defendant] would keep bank statements, safe deposit box information or keys and other financial records or instruments in his house over an extended period of time[.]") (internal citations omitted).

Moreover, although the specific transactions referenced in the affidavit occurred between May and October 2022, Special Agent Rusakiewicz explained that in this investigation specifically he had "obtained electronic evidence from phones well after the underlying illegal transactions, plainly showing the retention of information." ECF 149-1 at ¶ 64. Therefore, there was a fair probability to believe that evidence concerning the offense would continue to exist on electronic devices. *United States v. Farmer*, 370 F.3d 435, 439 (4th Cir. 2004) (cleaned up) (noting that offenses such as "money laundering [are] not mere isolated violations of the law, but criminal activity of a protracted continuous nature.").

Therefore, there was more than ample probable cause and a nexus to search Osemwenkhae's residence for the records and information the search warrant sought.

### C. Even If Probable Cause was Lacking, Special Agent Rusakiewicz Relied Upon the Warrant in Good Faith

Even if this court were to find that an affidavit failed to establish a substantial basis for probable cause, the defendant is not entitled to have the evidence from the search suppressed. The Supreme Court has held that when officers seize evidence in good faith reliance on a facially valid warrant issued by a neutral magistrate, and the affidavit is later found to lack probable cause, the evidence is not subject to the exclusionary rule of the Fourth Amendment and is admissible in the government's case-in-chief. *United States v. Leon*, 468 U.S. 897 (1984) (affidavit of experienced narcotics officer who acted in reliance on information provided by

informant of "unproven reliability" held to lack probable cause, but evidence seized by agent who acted in good faith reliance on the facially valid warrant was not subject to suppression). *See also United States v. Burton*, 756 F. App'x 295, 301 (4th Cir. 2018) ("[W]e will not apply the exclusionary rule to evidence that a law enforcement officer has obtained "in objectively reasonable reliance on" a search warrant. Under this good faith exception to the exclusionary rule, "searches conducted 'pursuant to a warrant will rarely require any deep inquiry into reasonableness, for a warrant issued by a magistrate normally suffices to establish that a law enforcement officer has acted in good faith in conducting the search.").

Here, the facts in the affidavit clearly established that Judge Aslan had a substantial basis to believe that there was probable cause to search the Stanwich Residence. Special Agent Rusakiewicz affidavit is thorough and detailed. The affidavit provides an overview of the scheme, connects Gift to the scheme, and spends multiple pages connecting Gift to the Stanwich Residence. Therefore, Special Agent Rusakiewicz's reliance on the warrant was objectively reasonable. The fact that Judge Aslan issued a search warrant based on the four corners of the affidavit only adds to Special Agent Rusakiewicz's objectively reasonable belief and reliance.

Osemwenkhae argues, however, that the good faith exception is inapplicable because Judge Aslan "wholly abandoned her role as the judicial determiner of probable cause." ECF 149 at 8. Osemwenkhae offers no argument to support this claim. Second, Osemwenkhae also contends that the good faith exception is inapplicable because "the affidavit it is so lacking in probable cause that it was unreasonable for anyone to believe that probable cause existed to search the" Stanwich Residence. *Id.* As reflected above, this argument similarly finds no support in the record. There was more than a substantial basis to find probable cause to search. But even if the facts were as Osemwenkhae wishes them to be, in the *Leon* contest,

Osemwenkhae's Motion would still fail.   The standard under *Leon* is far less demanding.   The Court need only find an "indicia of probable cause."   As mentioned above, there were, at the very least, multiple indications that Osemwenkhae resided at the Stanwich Residence. Osemwenkhae's vehicle was seen at the Stanwich Residence two-days before the warrant was issued, and previous surveillance had captured him there between 2023 and 2024, with cell phone data to support it.   It is objectively reasonable for law enforcement to relied on such information.

Accordingly, because the warrant was supported by probable cause and law enforcement officers acted in good faith in securing and executing the warrant, the motion to suppress should be denied.

### III.    Defendant's Motion To Set A Deadline For The Disclosure Of Other Crimes, Wrongs, or Acts (ECF 150)

The government's discovery letters have consistently advised the defendant of the following:

> At a reasonable time prior to trial, the Government will also provide you with copies of all relevant physical and documentary evidence believed by the government to fall within the ambit of Rule 404(b), which the Government intends to introduce at trial in its case-in-chief.   The Government acknowledges its continuing duty to disclose Rule 404(b) evidence as it is recognized as such.

The government continues to produce relevant discovery, whether intrinsic or otherwise, and intends to provide notice of any Rule 404(b) evidence if it is recognized as such.   Due to the extensive nature of the Defendant's criminal activities in furtherance of the conspiracy, at the present time, the government anticipates that the vast majority, if not all, evidence at trial will all be intrinsic to the charges then pending.   There is simply no reason for this Court to set such a deadline.   If the Court were inclined to set such a deadline, the government submits that a deadline no more than a month prior to trial would be appropriate.

**IV.    The Defendant's Motion For Pretrial Government Designation Of All Of The Defendant's Admissible Statements Should Be Denied (ECF No. 151).**

Osemwenkhae's demand to designate statements under Rule 801 is an extraordinary request, and not one this Court should entertain.   Rule 801 is a rule of admissibility—not disclosure.   The Fourth Circuit has long recognized this fact and refused to require district courts to engage in exactly the type of analysis that Osemwenkhae now presses—needless pretrial hearings months in advance of trial to determine the admissibility of defendant statements.   *See United States v. Hines*, 717 F.2d 1481 (4th Cir. 1983) (rejecting a Fifth Circuit approach – since overruled – requiring a "James" hearing on the existence of a conspiracy before district courts could admit statements under Rule 801 during the government's case-in-chief); *United States v. Blevins*, 960 F.2d 1252, 1255 (4th Cir. 1992) (affirming on an abuse of discretion standard the district court's proper admission at trial of Rule 801 statements); *United States v. Chindawongse*, 771 F.2d 840, 844 (4th Cir. 1985) (affirming admission of Rule 801 statements).

It is highly unusual for Rule 801 issues to arise from a defense motion.   Typically, if there is a particularly important statement at trial, the government may file a motion in *limine* for an admissibility determination.   As an example, Rule 801(d)(2)(E) provides that statements "offered against an opposing party and . . . made by the party's coconspirator during and in furtherance of the conspiracy" are not hearsay.   "In order to admit a statement under 801(d)(2)(E), the moving party must show that (i) a conspiracy did, in fact, exist, (ii) the declarant and the defendant were members of the conspiracy, and (iii) the statement was made in the course of, and in furtherance, of the conspiracy."   *United States v. Graham*, 711 F.3d 445, 453 (4th Cir. 2013).   "A statement by a co-conspirator is made 'in furtherance' of a conspiracy if it was intended to promote the conspiracy's objectives, whether or not it actually has that

effect." *Id.* (quoting *United States v. Shores*, 33 F.3d 438, 443 (4th Cir. 1994) (internal quotations omitted). "Statements made by a co-conspirator to a third party who is not then a member of the conspiracy are considered to be 'in furtherance' of the conspiracy if they are designed to induce that party either to join the conspiracy or to act in a way that will assist it in accomplishing its objectives, . . . but not if they were intended to be nothing more than idle chatter or casual conversation about past events." *Shores*, 33 F.3d at 444 (internal citations omitted).

In contrast to such a narrow motion in *limine* to address a particularly pivotal statement, however, Osemwenkhae errs in supposing that Rule 801 is a rule of discovery as opposed to admissibility, and he further errs in improperly asking this Court to require the government to designate and litigate in advance the admissibility of every statement he made during the course of a multi-year conspiracy.   Such a proposal is improper, and to the extent that particular statements become at issue between the parties, such a dispute is entirely premature for resolution at this time.

Practically, it makes the most sense for the Court to admit statements subject to foundation at trial, an option this Court retains and should not attempt to address in the context of pretrial motions practice.   *Id*.   Indeed, this approach makes sense here, especially because trial is set for September 29, 2025.   Because the Government's basis for admissibility does not become fixed and determinative until trial – and contrary to the suggestions of the Defendant, the government will properly continue to investigate, develop evidence, and make discovery disclosures until trial – it makes little sense to try to adjudicate such evidentiary issues this far in advance.   That is particularly true because witnesses and their testimony, which may evolve and change by the time trial begins, can affect admissibility trial determinations.

Additionally, contrary to Osemwenkhae's assertions, he knows many of the most relevant written statements that will likely be used against him at trial. As noted earlier, the Government provided Osemwenkhae with detailed discovery that included extensive financial records and cellular data. There are extensive encrypted chats in writing for the Defendant to review in discovery. The Superseding Indictment also specifically identifies multiple transactions Osemwenkhae was involved with. And, most recently, discovery has been provided in a reorganized format by fraud victim. It may take defense counsel some time to review the discovery and learn the case, but it is entirely doable and defense counsel ought to do it. Of course, the Defendant undoubtedly made statements in conversations with co-conspirators that will be admissible at trial. The government does not need to detail those in advance, and frankly will not determine what verbal statements it intends to introduce until the trial witness list is finalized, and witnesses participate in final preparatory debriefings close to trial.

Last, it should not go without mention that some of the underlying predicate claims in this motion are entirely inconsistent with opposing counsel's repeated representations as to his readiness for trial when demanding a speedy trial. Yet now—clearly attempting to obtain a detailed disclosure of the Government's evidence at trial—counsel asserts that because of the volume of discovery, "[e]ven if the trial were set yuears [sic] into the future, it would [sic] impossible for the defense to review, identify, investigate, and prepare to defend against all the conceivable communications." ECF 151 at 2. The Court should deny Osemwenkhae's motion to require the government to engage in a totally unnecessary and unprecedented pretrial identification of the Defendant's statements.

## **CONCLUSION**

Based on the foregoing, this Court should deny all of the Defendant's pretrial motions.

Respectfully submitted,

Erek L. Barron
United States Attorney

_____/s/_____
Harry M. Gruber
Bijon A. Mostoufi
Jared Beim
Assistant United States Attorneys
36 S. Charles Street, 4th Floor
Baltimore, Maryland 21201-2692
(410) 209-4800

### CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing Government's filing was served via ECF on the above-captioned Defendant's counsel.

_____/s/_____
Harry M. Gruber
Assistant United States Attorney